## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

BENNY L. WILLIS,                    )
                                    )
        Plaintiff,                  )
                                    )        Case No. 11 C 1315
        v.                          )
                                    )        Judge Joan H. Lefkow
DR. MARY LOFTIN,                    )
                                    )
        Defendant.                  )

## OPINION AND ORDER

Plaintiff Benny L. Willis, an inmate at the Robinson Correctional Center ("Robinson")

between February 17, 2010 and April 19, 2011, brought this action under 42 U.S.C. § 1983

against Robinson's medical director, Dr. Mary Loftin.[1]  Willis alleges that Loftin failed to

properly treat his eczema in violation of the Eighth Amendment to the United States

Constitution.  Currently before the court is Loftin's motion for summary judgment.  (Dkt. 66).

For the following reasons, the motion is granted in part and denied in part.[2]

## LEGAL STANDARD

Summary judgment obviates the need for a trial where there is no genuine issue as to any

material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P.

---

[1] Willis also brought this suit against Dr. Kublir Sood, a doctor who treated Willis at the Will County Adult Detention Facility.  (*See* dkt. 8 ¶ 1.)  Willis voluntarily dismissed his claims against Sood with prejudice.  (*See* dkts. 17, 19.)  Loftin previously moved to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6), arguing that Willis's complaint alleged no more than a disagreement over his treatment.  (Dkt. 15.)  The court denied the motion, holding that Willis adequately alleged deliberate indifference in his complaint even though "it may well be that [he] will be unable to prove deliberate indifference."  *Willis* v. *Loftin*, No. 11 C 1315, 2011 WL 6318940, at *4 (N.D. Ill. Dec. 15, 2011) (dkt. 24).

[2] The court has jurisdiction under 28 U.S.C. § 1331.  Venue is appropriate in this district under 28 U.S.C. § 1391(b).

56(a).  A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).  To determine whether any genuine fact issue exists, the court must pierce the pleadings and assess the proof as presented in depositions, answers to interrogatories, admissions, and affidavits that are part of the record.  Fed. R. Civ. P. 56(c).  In doing so, the court must view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor.  *Scott* v. *Harris*, 550 U.S. 372, 378 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007).  The court may not weigh conflicting evidence or make credibility determinations.  *Omnicare, Inc.* v. *UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011).

The party seeking summary judgment bears the initial burden of proving there is no genuine issue of material fact.  *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).  In response, the non-moving party cannot rest on bare pleadings alone but must designate specific material facts showing that there is a genuine issue for trial.  *Id.* at 324; *Insolia* v. *Philip Morris Inc.*, 216 F.3d 596, 598 (7th Cir. 2000).  If a claim or defense is factually unsupported, it should be disposed of on summary judgment.  *Celotex*, 477 U.S. at 323-24.

## BACKGROUND[3]

### I.     Willis's Eczema

Willis began exhibiting symptoms of severe, chronic eczema as a child.  (Dkt. 74 ("Def. L.R. 56.1 Resp.") ¶ 1.).  When not treated properly, his eczema causes him to scratch his skin

---

[3] In accordance with its regular practice, the court has considered the parties' objections to the statements of fact and responses and includes in the background section only those that are appropriately presented, supported, and relevant to the resolution of these motions.  Any facts that are not controverted as required by Rule 56.1 are deemed admitted.  *See* L.R. 56.1(a) ("All material facts set forth in [the Rule 56.1 statement] will be deemed admitted unless controverted by the statement of the moving party."); *see also Collins* v. *United States*, 894 F. Supp. 2d 1051, 1055 (N.D. Ill. 2012).

relentlessly, leading to bleeding and scarring. (*Id.*) Willis, who has spent much of his adult life in and out of prison, believes that he was first diagnosed with eczema while incarcerated in 1997. He subsequently has been treated by doctors at various penitentiaries throughout the state. (Dkt. 69 ("Pl. L.R. 56.1 Resp.")[4] ¶¶ 10-11.) These doctors have tried a variety of treatments for Willis's eczema, including antihistamines and topical steroids in both ointment and lotion form. (*Id.* ¶ 11.) Willis's eczema was most successfully treated during his incarceration at Danville Correctional Center ("Danville") between 2000 and 2002 when he received Cyclocort lotion, a topical steroid, and Vitamin E cream. (Pl. L.R. 56.1 ¶ 2.) Willis testified that this combination is the only treatment that has ever provided him with "permanent relief" for his eczema. (Dkt. 68, Ex. 2, Deposition of Benny Willis ("Willis Dep.") at 119:4-9.)

## II.     Willis's Treatment At Robinson Correctional Center

Willis entered Robinson Correctional Center ("Robinson") on February 17, 2010, and remained there until he was released on parole on April 19, 2011. (Dkt. 68 ("Def. L.R. 56.1") ¶ 3.) Loftin treated Willis during his incarceration. (*Id.* ¶ 4.) When Willis arrived at Robinson, he had a prescription for a cortosteroid ointment called Triamcinolone that he had obtained at another facility. (*Id.* ¶ 24.) Loftin renewed the prescription for one month until she was able to examine him in person. (*Id.*)

### A.     Initial Treatment

Loftin first examined Willis on March 19, 2010. During the examination, Willis told Loftin that Cyclocort lotion and Vitamin E cream was the most effective treatment for his eczema and that the Triamcinolone ointment he currently was using made him itch more. (*Id.* ¶ 26.) Loftin's examination notes reflect that Willis had "large areas of thick, dark, hyper-

---

[4] Willis's 56.1 response statement and his own 56.1 statement are both included in docket 69. The court refers to his response as "Pl. L.R. 56.1 Resp." and to his own statement of facts located at the end of docket 69 as "Pl. L.R. 56.1."

pigmented skin" on his extremities and trunk but no evidence of any infection. (*Id.* ¶ 25.) She diagnosed a severe eczematous rash. (*Id.*) After the visit, Loftin replaced Triamcinolone with Lidex ointment, which contains a stronger steroid than both Triamcinolone (Willis's current medication) and Cyclocort (Willis's preferred treatment). (Dkt. 68, Ex. 6, Deposition of Mary Loftin ("Loftin Dep.") at 42:20-43:15.) She also decided not to prescribe Cyclocort because if it had been as effective as Willis claimed, then his skin would not be as damaged as it was. (*Id.* at 44:21-25.) Additionally, Lidex was on the Illinois Department of Corrections ("IDOC") formulary, whereas Cyclocort was not. (*Id.* 43:9-15.) Loftin chose the ointment form of Lidex instead of the lotion form because, in her experience, it provided patients with more hydration.[5] (*Id.* at 63:17-21.) Loftin also prescribed Benadryl to help reduce Willis's scratching at bedtime. (*Id.* at 42:22-43:6.) In addition, Loftin purchased a bottle of Vitamin E lotion at a local store with her own money for Willis.[6] (*Id.* at 45:21-23.)

Two months later, on May 15, 2010, Willis complained to a nurse that he could not sleep due to itching. (Def. L.R. 56.1 ¶ 39.) The nurse contacted Loftin, who was off-site, and Loftin authorized a two-day prescription of Vistaril, a more potent antihistamine that she believed would help Willis sleep. (*Id.* ¶ 40.) A few days later, on May 19, 2010, Willis asked a nurse for Cyclocort lotion. (*Id.* ¶ 41.) The nurse contacted Loftin, who was off-site again and did not have access to Willis's records. (*Id.* ¶¶ 41-42.) Loftin authorized a prescription for

---

[5] Loftin's expert, Dr. Stephen Wolverton, opined that ointments are more potent and more hydrating than creams and lotions. (Dkt. 68, Ex. 12, Report of Dr. Stephen Wolverton ("Wolverton Report") at 6.) Willis's expert agrees that lotions have a "slight drying effect" whereas ointment "tends to be hydrating." (Dkt. 68, Ex. 9, Deposition of Dr. Barry Auster ("Auster Dep.") at 16:11-21.) He also opined, however, that lotions have "more of an anti-itch effect" than ointments. (*Id.*)

[6] Willis concedes that this treatment plan—a steroid, an oral antihistamine, and over-the-counter Vitamin E lotion—is a widely accepted treatment regimen for eczema but disputes whether it was appropriate for him in particular. (Pl. L.R. 56.1 Resp. ¶ 37.)

Triamcinolone ointment and scheduled Willis for a punch biopsy.[7]  (*Id.* ¶ 42.)  Loftin performed

the biopsy on June 2, 2010.  It was the first punch biopsy performed on Willis.  (*Id.* ¶¶ 43-44.)

Loftin also permanently changed Willis's antihistamine from Benadryl to Vistaril to reduce

Willis's itching and improve his sleep.  (*Id.* ¶ 46.)

### B.    Dermatologist Visit and Post-Visit Treatment

Loftin met with Willis again to explain the results of the punch biopsy, which showed

that Willis did not have any more serious condition than eczema.   She also prescribed Lidex

ointment and calamine lotion after Willis complained again about itching.  (*Id.* ¶¶ 47-48.)  In

addition, Loftin referred Willis to an outside dermatologist.  She was the first IDOC physician to

do so for Willis.  (*Id.* ¶¶ 49-52.)

Willis saw a dermatologist's physician assistant ("PA") at an outside dermatologist office

on August 10, 2010.  (*Id.* ¶ 53.)  The PA diagnosed Willis's condition as "eczematous

dermatitis/irritant dermatitis" and recommended that Willis use Triamcinolone cream and an

over-the-counter moisturizer.  (*Id.*)  But because Willis had said that Triamcinolone did not

work, Loftin submitted a non-formulary request for "1 bottle [of] Cyclocort."  (*Id.* ¶ 55; dkt. 68,

Ex. 3, Medical Records of Benny Willis ("Willis Records") at 9.)  She did not specify whether

the request was for the ointment or lotion.[8]  The brand name version of Cyclocort was no longer

produced so Willis received the generic version, Amcinonide, in ointment form.  (Def. L.R. 56.1

¶ 57.)  He continued to receive, and accepted, Amcinonide ointment each month from August 21,

2010 through March 14, 2011.  (*Id.* ¶ 58.)  He also requested and received an over-the-counter

---

[7] "During a punch biopsy, a doctor uses a special circular blade to remove deeper layers of skin
for testing."  Mayo Clinic, "Punch biopsy," available at http://www.mayoclinic.org/tests-procedures/skin-
biopsy/multimedia/punch-biopsy/img-20005764 (last visited July 22, 2014).

[8] Whether "bottle" necessarily implies lotion is at dispute.  (Def. L.R. 56.1 ¶ 55; Pl. L.R. 56.1
Resp. ¶ 55.)

moisturizer, Minerin cream, several times between September 1, 2010 and his release. (*Id.* ¶¶ 58, 59.) Loftin testified that there was no objective change in Willis's condition between when she first saw him in March 2009 and when she saw him in July 2009 to discuss the results of his punch biopsy. (Loftin Dep. at 57:15-58:9.) Willis, however, testified that his condition "progressed a lot" during his 13 months at Robinson. (Willis Dep. at 102:20-23.)

### C. December 2010 Grievance

On December 13, 2010, Willis filed a grievance with his IDOC counselor. (Dkt. 68, Ex. 13, Benny Willis Dec. 13, 2010 Grievance ("Willis Grievance").) In the "relief requested" section, he wrote, "I need 'cyclocort' to ease my pain and suffering. I need to go back to the dermatologist so they can help me in any way they see fit." (*Id.*) He went on to explain that he had told Loftin that Cyclocort lotion "works well at maintaining my skin condition." (*Id.*) He noted that since visiting the dermatologist he had been using Amcinonide ointment and Minerin cream, along with the generic brand of Lidex, Fluocinonide, and taking Benadryl. Willis wrote that he has been "waiting for months to go back to the dermatologist" and that he "stay[s] up all night most days of the week scratching my entire body relentlessly" due to his "excruciating" pain. (*Id.*)

Loftin received the grievance from Willis's counselor on January 3, 2011. (*Id.*) She responded in writing to prison counselors the next day and explained that Willis had been prescribed Triamcinolone and Lidex, neither of which helped the rash. (Dkt. 68, Ex. 14, Mary Loftin's January 4, 2011 Response ("Loftin Resp.").) She noted that she did a punch biopsy and sent the results to the dermatologist Willis visited, who recommended that he use Triamcinolone but she "did not write a new prescription for that as it had not worked in the past." (*Id.*) Loftin also noted in her response that there would be "nothing new for a dermatologist to review," as

Willis "had the skin condition for many years prior to incarceration, and had dark spots when he came into IDOC." (*Id.*) She concluded by noting that "Cyclocort (amcinonide) was issued to the patient on 8/21, 9/12, 10/13, 11/4, and 12/15" and that the prescription was still in effect. (*Id.*) Loftin also communicated her response to Willis's counselor, who included much of the same information on Willis's grievance form. (*See* Willis Grievance.) Willis's counselor also wrote that Willis was "[a]dvised to return to sick call. Cannot resolve at counselor level." (*Id.*) Although Willis testified at his deposition that he "definitely went to [Loftin] and told her, man, I don't know what this is, but this is not working at all" and told Loftin that his medication had made his eczema worse (Willis Dep. at 101:15-18), other than the grievance there is no indication in his medical records that he saw Loftin after August 2010, that he requested any appointments with her, or that he requested treatment other than refills of his medication between August 2010 and March 2011. (Pl. L.R. 56.1 Resp. ¶¶ 60-61.)

### D. Post-Grievance Treatment

On March 10, 2011, Willis requested Triamcinolone and Benadryl before his release on April 19, 2011. (Willis Records at 25.) He testified that he told Loftin he would rather use Triamcinolone because his current medications, which included the Amcinonide ointment, made him feel worse. (Willis Dep. at 106:11-107:9.) Willis continued to receive Amcinonide until he was released on April 19, 2011. (Def. L.R. 56.1 Resp. ¶¶ 24-25.) He last saw medical professionals at Robinson on April 16, 2011, at which time his current medications were listed as Cyclocort and Minerin. (Willis Records at 55.)

Since leaving Robinson, Willis has continued to receive Triamcinolone from other medical providers and he testified that it is effective for providing temporary, but not permanent, relief. (Def. L.R. 56.1 ¶¶ 74-78; Willis Dep. at 116:21-117:11.)

## III.     Expert Testimony

Willis and Loftin both engaged experts to opine on the reasonableness of Loftin's treatment.  Willis's expert, Dr. Barry Auster, listed three main deficiencies:  (1) Loftin's treatment was inadequate because she prescribed medications other than Cyclocort lotion and Vitamin E cream, which Willis told Loftin had worked in the past; (2) Loftin's treatment was inadequate because she prescribed topical steroids after Willis complained that they caused his eczema to itch or had proven unsuccessful; (3) Loftin prescribed topical steroids that may have exacerbated Willis's condition.  (Dkt. 68, Ex. 11, Expert Report of Dr. Barry Auster ("Auster Report") at 6-7.)  Auster opined that high-potency ointments "may adversely affect a patient by severely drying out the skin" and "patients may be allergic to the molecular base of certain vehicles."  (*Id.* at 7.)  Auster believes that Loftin's failure to prescribe lotions "may have contributed to [Willis's] condition deteriorating to the point that he suffered personal disfigurement."  (*Id.*)  He does agree, however, that topical steroids are the customary way to treat eczema and explained that he prescribes them to "a hundred percent" of his eczema patients.  (Dkt. 68, Ex. 9, Deposition of Barry Auster ("Auster Dep.") at 25:13-16.)  Moreover, Auster seemed to contradict his report at his deposition by testifying that he "wouldn't say [the medications Loftin prescribed] aggravated [Willis's condition], but it didn't get better.  I wouldn't necessarily say [Willis] exacerbated it, but he did not get any better."  (*Id.* at 108:8-14.)

Loftin's expert, Dr. Stephen Wolverton, presents the opposite opinion, that Loftin went "above and beyond" the normal standard of care.  (Dkt. 68, Ex. 12, Report of Dr. Stephen Wolverton ("Wolverton Report") at 4.)  Wolverton provides six main reasons for his conclusion:  (1) Loftin relied on "solid medical principles" in explaining the medications she prescribed and made at least one change in Willis's therapy each time she saw him; (2) Loftin was reasonable to

choose an ointment over a lotion because it is more potent and more hydrating than lotion, and because it does not require preservatives, unlike creams or lotions; (3) it was reasonable not to give Willis the mixture of Cyclocort lotion and Vitamin E cream merely because he requested it, as his successful use of the combination while at another prison was from ten years earlier when his eczema was less severe; (4) Loftin's choice to administer oral antihistamines was appropriate because skin itching is often worst at night; (5) Willis's medical records indicate that the only long-term consequence he has suffered is hyperpigmentation, which produces little to no scarring; and (6) Loftin did more to evaluate Willis than any other IDOC physician, continued testing and treatment when his condition did not improve, and went so far as to purchase Vitamin E lotion for him with her own money.

## ANALYSIS

The Eighth Amendment prohibits the infliction of cruel and unusual punishment. "The Supreme Court has interpreted the Eighth Amendment's proscription against cruel and unusual punishment as imposing a duty upon the States, through the Fourteenth Amendment, 'to provide adequate medical care to incarcerated individuals.'" *Johnson* v. *Doughty*, 433 F.3d 1001, 1010 (7th Cir. 2006) (quoting *Boyce* v. *Moore*, 314 F.3d 884, 888-89 (7th Cir. 2002)); *see also Estelle* v. *Gamble*, 429 U.S. 97, 103-05, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976) ("We therefore conclude that deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain[ ]' . . . proscribed by the Eight Amendment.") (internal quotation and citation omitted).

An Eighth Amendment claim of deliberate indifference to serious medical needs contains both an objective and a subjective component. *See Greeno* v. *Daley*, 414 F.3d 645, 653 (7th Cir. 2005). "To satisfy the objective component, a prisoner must demonstrate that his medical

condition is 'objectively, sufficiently serious.'" *Id.* (quoting *Farmer* v. *Brennan*, 511 U.S. 825, 834, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994)).  To satisfy the subjective component, a prisoner must demonstrate that the prison official knew of and disregarded an excessive risk to inmate health, and thus acted with a "sufficiently culpable state of mind." *Greeno*, 414 F.3d at 653 (quoting *Farmer*, 511 U.S. at 834).  In other words, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837.  To recover damages under 42 U.S.C. § 1983 for an Eighth Amendment violation, the injured party "must establish that a defendant was personally responsible for the deprivation of a constitutional right." *Knight* v. *Wiseman*, 590 F.3d 458, 462-63 (7th Cir. 2009) (internal quotation and citation omitted).  Liability is imposed where defendants "know about the conduct and facilitate it, approve it, condone it, or turn a blind eye." *Id.* at 463 (internal quotation and citation omitted).

The objective component—that Willis's eczema is an objectively serious medical condition—is not in dispute.  Loftin argues that the subjective component is not satisfied because (1) she lacked a sufficiently culpable state of mind to qualify as deliberately indifferent to Willis's medical condition; and (2) even if she were found to have been deliberately indifferent, she has qualified immunity and thus is shielded from liability.

## I.    Whether Loftin Was Deliberately Indifferent to Willis's Medical Condition

The Seventh Circuit has observed that "'deliberate indifference' is simply a synonym for intentional or reckless conduct, and that 'reckless' describes conduct so dangerous that the deliberate nature of the defendant's actions can be inferred." *Qian* v. *Kautz*, 168 F.3d 949, 955 (7th Cir. 1999) (quoting *Brownell* v. *Figel*, 950 F.2d 1285, 1290 (7th Cir. 1991)); *see also Gayton* v. *McCoy*, 593 F.3d 610, 620 (7th Cir. 2010).  "[I]n the context of medical professionals,

it is important to emphasize that medical malpractice, negligence, or even gross negligence does not equate to deliberate indifference." *Doughty*, 433 F.3d at 1012-13 (citing *Dunigan ex rel. Nyman* v. *Winnebago County*, 165 F.3d 587, 592 (7th Cir. 1999)). "Mere dissatisfaction or disagreement with a doctor's course of treatment is generally insufficient" to establish an Eighth Amendment claim. *Doughty*, 433 F.3d at 1013 (citing *Snipes* v. *DeTella*, 95 F.3d 586, 592 (7th Cir. 1996)).

Despite this high threshold, a prisoner need not "show that he was literally ignored." *Arnett* v. *Webster*, 658 F.3d 742, 751 (7th Cir. 2011) (citing *Greeno*, 414 F.3d at 653). "A physician is deliberately indifferent when he persists in an ineffective treatment . . . for a serious condition." *Smego* v. *Mitchell*, 723 F.3d 752, 758 (7th Cir. 2013) (vacating summary judgment for prison physician who ignored inmate's untreated dental concerns and prescribed pain medicine to which inmate was allergic); *see also Berry* v. *Peterman*, 604 F.3d 435, 441 (7th Cir. 2010) (vacating summary judgment for doctor who refused to refer inmate to dentist in favor of having him take over-the-counter pain medications because "a jury could reasonably conclude that [the doctor] knowingly adhered to an easier method to treat [the inmate's] pain that she knew was not effective"); *King* v. *Chapman*, No. 09 C 1184, -- F. Supp. 2d ---, 2013 WL 6709623, at *16 (N.D. Ill. Dec. 16, 2013) ("Evidence that [the doctor] continued to prescribe medication that was ineffective in the face of [the inmate's] escalating pain is sufficient to maintain a claim of deliberate indifference against [the doctor].").

Courts may also infer deliberate indifference if a medical professional's acts are "blatantly inappropriate" or a "substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible did not base the decision on such a judgment." *King* v. *Kramer*, 680 F.3d 1013, 1018-19 (7th Cir. 2012) (summary judgment

for jail nurse unwarranted where question of fact remained whether her actions were "so far afield from an appropriate medical response to [defendant's condition] that they fell outside the bounds of her professional judgment") (internal citation and quotation marks omitted); *see also Greeno*, 414 F.3d at 654. A treatment delay that unnecessarily prolongs a plaintiff's suffering or exacerbates his condition can also constitute deliberate indifference. *See Berry*, 604 F.3d at 442.

Willis argues that Loftin's treatment of his eczema was inadequate, that her medical decisions were blatantly inappropriate when she continued with ineffective or detrimental courses of treatment, and that Loftin's good intentions are irrelevant. His complaints can be reduced to three actions Loftin did (or did not) take: (1) despite Willis continuing to ask for Cyclocort lotion, Loftin instead treated Willis for six months with medication that had proven ineffective or had exacerbated Willis's condition in the past; (2) Willis received Cyclocort (in the generic form Amcinonide) in ointment form as opposed to lotion form, which was Willis's preferred treatment; and (3) after prescribing Amcinonide, Loftin did not further adjust Willis's treatment, even after Willis filed a grievance describing significant suffering and asking for Cyclocort and another visit to the dermatologist.

### A. Prescribing Medication Other Than Cyclocort For Six Months

#### 1. Prescribing Triamcinolone and Lidex

The record shows two instances when Loftin prescribed medication that had previously shown to either be ineffective or exacerbate Willis's condition. On May 19, 2010, Loftin was off-site and received a phone call from a nurse who told Loftin that Willis had complained about itching. Loftin authorized a prescription for Triamcinolone ointment and scheduled an appointment for her to perform a punch biopsy on Willis when she returned. Then, after she performed the punch biopsy and scheduled an appointment for Willis with the dermatologist, she

prescribed Lidex ointment and calamine lotion. Willis had previously tried both Triamcinolone and Lidex ointments with little success.

A reasonable factfinder would not be able to determine that either of these errors—if they even can be considered as such—constitute deliberate indifference. Loftin made the first prescription on an emergency basis while off-site, conceding she did not have access to Willis's medical records "to see that he had said that that didn't control the itching and made him itch worse when I prescribed that." (Loftin Dep. at 51:20-52:8.) While Willis could argue that this prescription was negligent or careless, by no means does it reach the standard of deliberate indifference. *See Doughty*, 433 F.3d at 1012-13.

When Loftin later prescribed Lidex, she also referred Willis to an outside dermatologist. Although prescribing Lidex may not have been the best course of treatment, it certainly was not dangerous or a substantial departure from the norm. Loftin testified that Lidex is stronger than Triamcinolone and Cyclocort lotion, even though all three are cortosteroids, and there was no objective change in his rash from his past use of Lidex. (Loftin Dep. at 43:1-4, 56:11-58:3.) A reasonable finder of fact could not find that this "error" would rise to the level of deliberate indifference, especially when considering that Loftin also sought an outside opinion from a dermatologist at the same time. *Cf. Greeno*, 414 F.3d at 655 (jury could find deliberate indifference from prison doctor's refusal over two-year period to refer inmate to a specialist or authorize endoscopy where doctors knew of inmate's possible ulcer and inmate regularly vomited and was in pain). Further, as discussed, Loftin prescribed ointments because she felt that they are more hydrating than lotions, a sentiment echoed by both parties' experts. (Loftin Dep. at 64:11-16; Wolverton Dep. at 46:12-15, 48:14-16; Auster Dep. at 60:1-3.)

Willis relies on *Greeno* to argue that Loftin's persistence persisting with ineffective medication constituted deliberate indifference. In *Greeno*, prison medical officials noted the possibility that the inmate had an ulcer but "doggedly persisted in a course of treatment known to be ineffective" instead of properly diagnosing and treating him. *Id.* at 655. But Willis's complaints were not ignored and the treatment he did receive was not "so blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate' his condition." *Greeno*, 414 F.3d at 654. Loftin performed a biopsy and scheduled an appointment for Willis to see a dermatologist. Although she did not initially prescribe Willis's preferred medication, she prescribed stronger and medically reasonable eczema treatments.

## 2.      Failure to Prescribe Cyclocort

Loftin's failure to prescribe Cyclocort immediately does not rise to deliberate indifference. As noted, Loftin prescribed stronger medications that are generally accepted eczema treatments. Decisions between acceptable treatments for an inmate's condition, are "classic examples of matters for medical judgment . . . beyond the [Eighth] Amendment's purview." *Snipes*, 95 F.3d at 591 (brackets omitted).

Further, this case is distinguishable from the one on which Willis relies, *Gulley* v. *Ghosh*, 864 F. Supp. 2d 725 (N.D. Ill. 2012), in which the prison doctor refused to continue the treatment that the inmate had been receiving for the previous sixteen years to help alleviate pain caused by his sciatica. *Id.* at 729-30. The doctor first refused to prescribe the inmate any sciatica pain medication for six months, and then prescribed him the medication that had worked in the past but at one-sixth the strength. By contrast, Willis told Loftin that the combination of Cyclocort lotion and Vitamin E cream, which he had received between 2000 and 2002, had been effective. It was reasonable for Loftin to believe that she should prescribe *stronger* medications

than Cyclocort (which Willis had received almost a decade before) along with antihistamines to help Willis sleep.[9] (*See* Loftin Dep. at 45:1-16.)

Finally, the fact that Loftin initially chose one of the IDOC formulary medications does not, in and of itself, demonstrate deliberate indifference. A doctor's "preference for a less costly treatment is not deliberate indifference unless [there is] evidence that the [recommended treatment] 'was so inadequate that it demonstrated an absence of professional judgment, that is, that no minimally competent professional would have so responded under those circumstances.'" *Jones* v. *Drew*, 221 F. App'x 450, 454-55 (7th Cir. 2007) (quoting *Collignon* v. *Milwaukee Cnty.*, 163 F.3d 982, 989 (7th Cir. 1998)). As already discussed, Loftin's decisions to prescribe Triamcinolone and Lidex did not demonstrate an absence of professional judgment.

Thus, even though Loftin did not prescribe Cyclocort initially as Willis requested, she was not deliberately indifferent in failing to do so. Within the first six months of her treatment, Loftin reevaluated his medications several times, performed a test no other doctor had performed, and sent Willis to a specialist. No reasonable factfinder would find this behavior to be deliberately indifferent.

### B. Prescribing Amcinonide in Ointment, Not Lotion, Form

Even though the outside dermatologist recommended Triamcinolone, Loftin instead decided to prescribe Cyclocort because she knew Triamcinolone had not worked for Willis in the past. Specifically, Loftin prescribed "1 bottle Cyclocort" along with Eucerin cream. (Willis Records at 9.) Willis received the generic, Amcinonide, in ointment form. The record is unclear on whether Loftin purposefully prescribed ointment rather than lotion. Regardless, the court cannot find that her actions were deliberately indifferent. Loftin provided Willis with the

---

[9] *Gully* is also distinguishable for the simple reason that it was decided on a motion to dismiss and not a motion for summary judgment. *Gulley*, 864 F. Supp. 2d at 726.

medication he requested in a form that she believed was most effective.  Although Willis would have preferred lotion, Loftin's actions in prescribing one medically acceptable eczema treatment over another were not deliberately indifferent.  *See, e.g., King*, 2013 WL 6709623, at *17 (no deliberate indifference where prison doctor prescribed variety of medications in attempt to minimize inmate's pain).

Willis also argues that Loftin should not have prescribed the ointment form because it contains propylene glycol, which can be an irritant for some patients.  (*See* dkt. 69, Ex. 1.)  But Loftin testified that in her experience, she had not found ointments to be more irritating than lotions.  (Loftin Dep. at 65:15-18.)  Her decision to prescribe ointment as opposed to lotion was based on her sound medical judgment and experience and is not deliberate indifference.[10]  And if her prescription of Amcinonide ointment was unintentional, then it is at most negligence, which, as discussed above, does not amount to deliberate indifference.

### C.     Loftin's Failure to Re-Examine Willis After Prescribing Amcinonide

Willis argues that Loftin's response to his December 13, 2010 grievance was deliberately indifferent.  Loftin provided a written response to the grievance, which complained of excruciating pain, but did not examine Willis.  She also did not change his prescription or send him back to the dermatologist.  When Willis asked for Triamcinolone instead of Cyclocort in March 2011, he continued to receive Amcinonide ointment until he was released.

The record is unclear on when Loftin learned that Willis was experiencing "excruciating pain" while using Amcinonide ointment.  Loftin argues that she did not learn of his pain until she received his grievance in January 2011, and his medical records do not indicate otherwise.

---

[10] Moreover, it is unclear from the record whether propylene glycol exists just in Amcinonide ointment or whether it is in the lotion as well, or whether Willis actually has a sensitivity to propylene glycol.  (Def. L.R. 56.1 Resp. ¶ 32.)  And as Loftin's expert explained, the chance of Willis being especially sensitive to propylene glycol or another chemical in the ointment is "[t]heoretically possible" but "extremely remote."  (Wolverton Dep. at 64:15-65:6.)

Willis, however, testified at his deposition that he told Loftin that the Amcinonide and his other medications were not working. (Willis Dep. at 100:11-101:18.) Taking the evidence in the light most favorable to Willis, as the court must, Loftin knew that Willis's new treatment regimen was not working but did nothing to change it. Even if she had not learned about the relative inefficacy of this treatment until the grievance reached her in January, a reasonable jury could find that she still was deliberately indifferent in failing to do anything about it. She did not take any steps to alleviate the excruciating pain that Willis complained of in the grievance and there is no indication that she saw Willis again. Although Loftin responded to Willis's grievance by writing that there was no new information for a dermatologist to review, it is unclear to the court how she could have arrived at this conclusion without examining Willis. That Willis requested a medication he was already taking does not excuse Loftin's failure to follow up with him before deciding that he required no further treatment.

While Willis's counselor did note in response to his grievance that he could attend sick call, the onus is not entirely on the inmate when the medical provider "become[s] aware of a prisoner's serious medical need" but "consciously disregarde[s] it nonetheless." *Doughty*, 433 F.3d at 1018 (quoting *Mathis* v. *Fairman*, 120 F.3d 88, 91 (7th Cir. 1997)). A reasonable factfinder could determine Loftin was deliberately indifferent in failing to follow up with Willis after learning by January 2011 at the latest that the medication she prescribed was not only not working, but was causing him excruciating pain.[11]

---

[11] Picking up on a few fleeting statements in Willis's 56.1 Statement and response brief regarding the emotional pain and embarrassment Willis's eczema caused him, Loftin devotes a section of her reply brief to arguing that the Prison Litigation Reform Act bars Willis from recovering for any emotional distress. Because this issue is not fully developed, however, the court will not rule on it at this time.

## II.    Qualified Immunity

Having determined that a reasonable factfinder could find Loftin was deliberately indifferent for failing to see Willis at any time after learning that he was in excruciating pain, the court turns to whether she is protected by qualified immunity. Loftin is entitled to qualified immunity if her "conduct d[id] not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Estate of Escobedo* v. *Bender*, 600 F.3d 770, 778 (7th Cir. 2010) (quoting *Sallenger* v. *Oakes*, 473 F.3d 731, 739 (7th Cir. 2007)). The qualified immunity inquiry has two prongs, which the court need not consider in sequence: (1) Whether, taking the facts in the light most favorable to Willis, Loftin's conduct violated a constitutional right; and (2) whether the constitutional right was clearly established at the time of the alleged violation. *See id*. The Seventh Circuit has indicated that prison doctors may be entitled to assert qualified immunity in certain circumstances. *See Currie* v. *Chhabra*, 728 F.3d 626, 632 (7th Cir. 2013) (considering, without deciding, whether a prison physician is entitled to seek qualified immunity).

Qualified immunity does not apply in this particular case. With regard to the first prong of the test, Willis has established the deprivation of his valid constitutional rights by demonstrating that Loftin dismissed his complaints of excruciating pain without even seeing him. As to the second prong, the law is clear that a prison doctor cannot consciously disregard a prisoner's medical need once she becomes aware of it. *See, e.g., Doughty*, 433 F.3d at 1018; *see also Keller* v. *Elyea*, 496 Fed. App'x 665, 667 (7th Cir. 2012) ("[A] supervisor may be liable when he turns a blind eye to an inmate's letters requesting medical treatment."). Once Loftin received Willis's grievance, it was improper for her to summarily discount his complaints and

determine that nothing about his condition had changed without seeing him.  Qualified immunity thus does not apply to the remaining issue in this suit.

## CONCLUSION AND ORDER

For the foregoing reasons, Loftin's motion for summary judgment is granted on all claims other than Willis's claim of deliberate indifference for Loftin's failure to see him or treat him after prescribing the Amcinonide.  In light of the significantly narrowed scope of this suit, the parties should consult regarding a consensual resolution of the remaining issue.  The parties will report on the status of their discussions at a status hearing on August 26, 2014 at 11:00 a.m.

Date:  August 4, 2014

_____

U.S. District Judge Joan H. Lefkow